UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH TETI ) | |
|     Petitioner ) | |
| v. ) | Civil Action No. 10234-RWZ |
| ) | |
| KATHLEEN M. DENNEHEY ) | |
|     Respondent ) | |

**PETITIONER'S REPLY TO THE RESPONDENT'S OPPOSITION
TO THE PETITION FOR A WRIT OF HABEAS CORPUS**

INTRODUCTION

    Respondent's Opposition to Petitioner's Writ of Habeas Corpus fails on three grounds. First, Respondent contends that this Court should infer that Teti's federal claims were considered and dismissed by the state court, where Respondent cited state cases founded on federal law on direct appeal. This argument stands in irrefutable contradiction to Respondent's own established position that the use of state cases founded on federal law is irrelevant to federal habeas corpus practice. Second, an evidentiary hearing will show that Petitioner was represented by both McBride and Keene at trial, that McBride and Keen misrepresented that nature of their knowledge about Leo Lebollo to the trial judge, and that had McBride and Keene been truthful with the trail court, justice would have required a mistrial. Finally, Petitioner argues that because his trial counsel had an actual conflict of interest under Mikens v. Taylor, 1225 S.Ct. 1237 (2002), his right to effective assistance of counsel pursuant to Strickland v. Washington, 466 U.S. 668 (1984) was violated thereby necessitating relief on constitutional grounds.

    I.    THIS COURT SHOULD NOT CONSIDER RESPONDENT'S ARGUMENT
THAT DISMISSAL OF PETITIONER'S FEDERAL CLAIMS CAN BE
INFERRED FROM THE DISMISSAL OF HIS STATE CLAIMS,

1

BECAUSE THIS ARGUMENT IS CONTRARY TO RESPONDENT'S ESTABLISHED POSITION THAT THE SUPREME COURT PRECLUDES SUCH AN INFERENCE.

The argument is simple. Respondents ask this Court to infer that the State Court considered and rejected Petitioner's federal claims, despite the fact the State Court did not cite a single federal case or address any of Petitioner's federal claims. Yet this position is completely contrary to Respondents' established practice of filing Motions to Dismiss habeas corpus petitions, in which Respondents argue that this Court cannot infer that a claim was properly presented to the state court from the mere reference to a state case that is decided on some federal claims. Specifically, the Respondents claimed in Josselyn v. Dennehey; Docket #04-10621; Clements v. Maloney, Docket #03-10377; Barnoski v DuBois, Docket # 97-10906; Hardy v. DuBois, Docket # 01-10794; Hazard v. Pepe, Docket #00-10779, that the Supreme Court precludes this Court from inferring that the state court issued its decision on the basis of a federal constitutional claim merely because the petitions cite a state case that was decided on a federal claim. Yet here, Respondents claim:

> In its decision, the Massachusetts Appeals Court applied the performance/prejudice framework analysis mandated by Strickland. *It is of no consequence that the appeals Court did not explicitly mention Strickland when it applied the Massachusetts enunciation of the ineffective standard derived from Commonwealth v. Saferian, 336 Mass. 89,, 315 N.W. 878 (1974). As the First Circuit has affirmed, Saferian is the functional equivalent of Strickland."* (Opposition pp 12). The Respondents claim that *"Since the Appeals Court identified and articulated the substance of the Strickland standard, and was not presented with facts that were materially indistinguishable from those at issue in Strickland, the "contrary to" portion of the analysis drops from the equation." (Id).*

2

Respondents' now claim that this Court should not review any of Teti's claims denovo because the state court 's adjudication must have taken into account Teti's federal claims, even if it did not expressly cite any federal cases or claims. Here, respondents' position is without merit because it stands in sharp contrast to their own routine argument that this very inference is precluded.

II. DISCOVERY AND AN EVIDENTIARY HEARING WILL ESTABLISH THAT PETITIONER'S COUNSEL HAD CONFLICTS OF INTEREST THAT VIOLATED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

The Respondent takes the position that Keene played no role in Petitioner's defense following McBride's filing of his appearance, grounding this theory in Keene's and McBride's own assertions at trial (outside the presence of Teti) to that effect. Yet Teti was clearly of the opinion that both Keene and McBride represented him, as evidenced by his affidavit. Teti's affidavit also makes it clear that Teti was not aware that Keene represented Leo Lobello. Moreover, Keene and McBride themselves exchanged letters, post trial, that completely refute their trial position and the Respondent's contention here. These conflicts in the evidence require additional fact-finding.

McBride's statements to the Court about Keene's role at trial contain internal inconsistencies that further underscore the need for adversarial testing. First, McBride claimed that he did not receive the informant Leo LoBello's P.S.R. from attorney Keene, but received it from "other sources" McBride refused to name. (3:29). This claim is contradicted by the affidavit of Jason Teti, Joseph Teti's bother, as well as by a letter from Keene to appellate counsel indicating, "The issue of the confidential informant, Leo Lobello was something which we [Keene and McBride] discussed in detail. However on the second day of trial, to my astonishment, he [McBride] tried to hang me in open court

with what he alleged was a conflict of interest." (Exhibit A, 8/9/99 letter, pg. 1, pp. 3). Moreover, while Keene acknowledged in this letter that he and McBride had discussed Lobello's cooperation with the government and his role setting up Teti's arrest[1], trial transcripts from a sidebar conference reveal that Keene vowed to the Court, uncontroverted by McBride, that he did not discuss Lobello with McBride in any way whatsoever.

McBride, for his part, claims in a September 22, 1999 letter to Keene that he[McBride] told Keene prior to Teti's trial that LoBello was informing against Teti, and that Keene did not then reveal that he [Keene] represented LoBello. (Exhibit B, 9/22/99 letter). McBride's assertions are irreconcilable with Keene's assertion that he and McBride discussed "in detail" one of the most critical aspects of the case – whether they could prove LoBello entrapped Teti into selling cocaine. See Exhibit A, above.

At the same time, McBride's denial at trial and in his 9/22/99 letter that he knew Keene represented LoBello, or of any conflict that might arise from such representation, is belied by McBride's pre-trial letters to Commonwealth. A February 4, 1999 letter from McBride to assistant Attorney General, requesting a habe to oblige Lobello's presence at Teti's trial, incorporates information beyond what McBride could have garnered from Lobello's PSR (Exhibit C, 2/4/99 letter). Specifically, McBride sent a letter to Assistant Attorney General Parris, informing her, "[it is my] understanding from my investigation in this case is that the informant was arrested in Framingham and began cooperating with law enforcement authorities as a direct or indirect consequence of this

---

[1] "The issue of the confidential informant, Leo Lobello was something we discussed in detail..." (See letter from Bradford Keene to Rosemary Scapicchio, 8/9/99; Exhibit B).

arrest." McBride also made reference to LoBello's cooperation on state court matters, not contained in LoBello's PSR. McBride asked the Commonwealth to turn over all information about LoBello that related to his relationship with the "State and Federal Government". Further, McBride told the Commonwealth that he "understand[s] that he [LoBello] participated in another arrest involving one, Gary Sweeney from Wayland, Massachusetts." McBride then provided the Commonwealth with an accurate address for LoBello. McBride's ability to give details of LoBello's past state and federal informant assistance and to provide an address within the federal correctional system for LoBello, when LoBello was a cooperating witness whose address was protected from dissemination, undermines McBride's claim at trial that he did not get any information about LoBello from Keene.

Finally, the State Court's finding that there was no evidence that Keene even knew LoBello was the informant against Teti prior to Teti's trial (R-91), conflicts directly with Keene's letter informing appellate counsel that he discussed LoBello with McBride "in detail" prior to trial. See Exhibit A. An evidentiary hearing will show that McBride and Keene both knew LoBello was the informant against Teti, and that LoBello was cooperating with the government against Teti and others.

An evidentiary hearing will demonstrate that both McBride and Keene jointly represented Teti at trial. Keene's contemporaneous roles as co-counsel to McBride, in representation of Teti, and as LoBello's attorney caused a square conflict. The evidence will also show that Keene knew that Lobello was an informant, cooperating against Teti, and that Keene shared that information with McBride. Keene's loyalty to his client LoBello (not to mention his concern for his own personal legal position) motivated him

5

to tell Teti's trial court that he (Keene) had not informed McBride of LoBello's position as the cooperator. Yet evidence indicates that Keene indeed did share the information with McBride. See Affidavit of Jason Teti; See Exhibit C. Moreover, McBride acknowledged that he, too, knew prior to Teti's trial that LoBello was informing against Teti.[2]

In light of the extensive factual disputes on the conflict issue, the Court should conduct an evidentiary hearing on the precise nature of the relationship between McBride, Keene and LoBello. There is little doubt--and we intend to show through discovery and an evidentiary hearing--that this conflict "adversely affected" the performance of Teti's lawyers by causing their judgment to be "fettered." Perillo, 79 F.3d at 447-49; see Cuyler v. Sullivan, 446 U.S. 335, 447-48 (1980).

I.   PETITIONER HAS MADE A "SUBSTANTIAL SHOWING" THAT HIS COUNSEL RENDERED INEFFECTIVE ASSISTANCE UNDER THE *STRICKLAND* STANDARD.

A.   The Strickland Test.

The Sixth Amendment guarantees a criminal defendant "the Assistance of Counsel for his defense." U.S. Const. Amend. VI. In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court established a two-part test a defendant must meet to establish ineffective assistance of counsel. First, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 688. To meet the "reasonableness" standard, counsel must "make reasonable investigations or . . . make a reasonable decision that makes particular investigations unnecessary." Id. at 691; see,

---

[2] See Exhibit B, page 2, paragraph 3, where McBride states, "*I* indicated to *you* [Keene] that the informant was indeed Leo LoBello…" pursuant to his Motion to Compel the Identification of the Informant. (Emphasis added).

6

e.g., Wiggins v. Smith, 123 S. Ct. 2527, 2535-36 (2003) (finding counsel ineffective for failure to investigate adequately); Williams v. Taylor, 529 U.S. 362, 393-98 (2000) (same); Lockett v. Anderson, 230 F.3d 695, 711-17 (5th Cir. 2000) (same). "[A]t a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case." Nealy v. Cabana, 764 F.2d 1173, 1177 (5th Cir. 1985); see, e.g., Rummel v. Estelle, 590 F.2d 103, 104 (5th Cir. 1979) (per curiam). Significantly, "Strickland does not require [the court] to defer to decisions that are uninformed by an adequate investigation into the controlling facts and law." Lockett, 230 F.3d at 714 (quotation omitted); see, e.g., Wiggins, 123 S. Ct. at 2538 ("Strickland does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy."); Bouchillon v. Collins, 907 F.2d 589, 597 (5th Cir. 1990) ("Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum.").

Second, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." Strickland, 466 U.S. at 692. To satisfy this requirement, the defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Id. at 693. Rather, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; see, e.g., Wiggins, 123 S. Ct. at 2542-44. A defendant who alleges a failure to investigate must show "what the investigation would have revealed and how it

would have altered the outcome of the trial." Lockett, 230 F.3d at 713 (quotation omitted).

1. Keene's Inadequate Performance.

Although Keene denies that he had an attorney-client relationship with Teti during the Teti's trial, he plainly did under well-settled principles. Contrary to the position the Respondent and the State Court have taken, "[a] professional relationship is not dependent upon the payment of fees . . . nor upon the execution of a formal contract." Westinghouse Electric Corp. v. Kerr-McGee Corp., 580 F.2d 1311, 1317 (7th Cir. 1978); see E.F. Hutton & Co. v. Brown, 305 F. Supp. 371, 388 (S.D. Tex. 1969). Nor does the existence of the attorney-client relationship turn upon whether counsel appears in court or makes strategy determinations. See Rubin v. Gee, 128 F. Supp. 2d 848, 867-69 (D. Md. 2001). Instead, the relationship "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." Westinghouse, 580 F.2d at 1319.

Here, Teti plainly had an objectively reasonable belief that Keene, in his capacity as an attorney, served as co-counsel on Teti's defense team at trial. Keene spoke daily with Teti about the case, including defense strategies and potential witnesses. Keene held himself out as Teti's attorney; the state court failed to make any inquiry as to what Teti believed. However, the government cannot dispute that it would be reasonable for a defendant to conclude that where two attorneys appear at his trial, and both attorney sit next to him and speak with him, both are representing him at trial.

Having established that Keene had an attorney-client relationship with Teti, there can be no question that he had a conflict of interest in his contemporaneous

representation of both Teti and the informant against Teti, Leo LoBello. See e.g,. Mikens v. Taylor, 1225 S.Ct. 1237 (2002).

    2.    Petitioner Exceeds the *Mikens* Requirement Of An "Actual Conflict" Because Keene Not Only Had An Actual Conflict, But In Addition, Prejudice Resulted.

Although the Mikens Court does not require a showing of prejudice in an actual conflict fact pattern like the one here, the inadequate performance of Keene and McBride prejudiced Teti. If Teti had known that Keene represented LoBello, Teti would have insisted that the Court declare a mistrial. Similarly, if Teti had known that McBride knew of Keene's conflict, he would not have consented to McBride's continued representation of him. If Teti was informed of his right to conflict free counsel, he would have demanded that both McBride and Keene withdraw and sought a mistrial.

If the Court appointed an independent conflict free attorney to advise Teti, Teti would have discovered the extensive corroboration set out above. There is at least a "reasonable probability"--that is, "a probability sufficient to undermine confidence in the outcome"--that "the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

There is at least a "reasonable probability" that an attorney who did not share the conflicts of Keene and McBride would not have called LoBello as a witness at all. An unconflicted attorney would have insisted on a mistrial and given Teti the opportunity to assess the case without LoBello and determine if a new strategy was necessary. See, e.g., id. at 715-17 (finding prejudice at penalty phase of capital case from counsel's failure to investigate mental health evidence); Nealy, 764 F.2d at 1178-80 (finding prejudice from counsel's failure to investigate alibi defense).

9

III.  KEENE'S CONFLICT OF INTEREST VIOLATED PETITIONER'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

A.  The Controlling Legal Standard

The right to effective assistance of counsel includes the right to an attorney who is not burdened by an actual conflict of interest. See, e.g., Perillo v. Johnson, 205 F.3d 775, 781 (5th Cir. 2000); Bucuvalas v. U.S., 98 F.3d at 655 (1st Cir. 1996)(holding that Sixth Amendment right to effective assistance of counsel is violated when an actual conflict of interest adversely affects counsel's representation).

In Cuyler v. Sullivan, 446 U.S. 335 (1980), the Supreme Court set forth the standard for ineffective assistance when counsel labored under a conflict of interest: "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Id. at 348 (footnote omitted). "An 'actual conflict' exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client." Perillo, 205 F.3d at 781. An "adverse effect" may be established "with evidence that some plausible alternative defense strategy or tactic could have been pursued, but was not because of the actual conflict impairing counsel's performance." Id. (quotation omitted). Unlike other ineffective assistance claims, "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice to obtain relief." Cuyler, 446 U.S. at 349-50 (citation omitted). Rather, "prejudice is presumed when counsel is burdened by an actual conflict of interest." Strickland, 466 U.S. at 692; see Perillo, 205 F.3d at 781.

10

      B.      <u>Keene Labored Under An Actual Conflict Of Interest, His Participation In Petitioner's Defense Precipitated The Failure to Pursue A Plausible Alternative Defense Strategy, Which Was In Inherent Conflict with Keene's Own Loyalties and Interests, And Thereby Petitioner's Right To Effective Assistance Of Counsel Was Compromised.</u>

The conflict under which Keene labored deprived Petitioner of his Sixth Amendment right to effective assistance of counsel. That conflict plainly impaired Keene's performance as Teti's attorney. <u>See, e.g., Rubin</u>, 128 F. Supp. 2d at 867-69 (finding Sixth Amendment violation based on actual conflict of counsel who did not appear in court or determine trial strategy, but played a "paralegal/investigative role").

In light of the fact that LoBello was a cooperating witness with information compromising Teti, and a personal interest in providing that information, not calling LoBello as a witness *for* Teti was--at a minimum--a "plausible alternative defense strategy or tactic" for Teti. <u>Id</u>. But Keene could not possibly have made an objective judgment whether Teti should pursue such a strategy, in light of the potentially disastrous consequences for himself and for his other clients. It is hard to imagine a clearer, and more blatantly prejudicial, conflict of interest.

<u>Mikens</u> governs all conflict situations. <u>See, e.g., Spreitzer</u> v. <u>Peters</u>, 114 F.3d 1435, 1451 n.7 (7th Cir. 1997); <u>United States</u> v. <u>McClain</u>, 823 F.2d 1457, 1463-64 (11th Cir. 1987). Keene clearly faced a conflict arising out of his multiple representation of LoBello on one hand and Petitioner on the other. This actual conflict requires reversal of Petitioner's conviction. <u>Mikens v. Taylor,</u> 1225 S.Ct. 1237 (2002).

CONCLUSION

      For all of the foregoing reasons this Court should allow Teti's petition for Habeas Corpus.

11

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above
document was served upon the attorney of record
for each party and upon any party appearing
pro se by first class mail, postage prepaid or by
hand delivery.

Dated: 7/21/05
Signed: _____

Respectfully Submitted,
JOSEPH TETI
By His Attorney

_____
Rosemary Curran Scapicchio
Four Longfellow Place
Suite 3703
Boston, Massachusetts 02114
(617) 263-7400
BBO # 558312

_____
Marcie Vaughan
Law Student
Suffolk University Law School
Four Longfellow Place
Suite 3703
Boston, Massachusetts 02114
(617) 263-7400

# BRADFORD ELIOT KEENE
### ATTORNEY AT LAW

PINEWOOD PARK SUITE C
7 KIMBALL LANE
LYNNFIELD, MASSACHUSETTS 01940

TEL: 781 246-9001   FAX: 781 246-3999

August 9, 1999

Rosemary Scapicchio, Esquire
4 Longfellow Place
# 3703
Boston, MA  02114

        **RE:** *COMMONWEALTH*
           *v.*
          *JOSEPH TETI*
         *INDICTMENTS*
        *98-10755 and 98-11761*

Dear Ms. Scapicchio:

  Pursuant to Joseph Teti's decision to retain you as Appellate Counsel, and per our previous discussions, enclosed please find his entire document file inclusive of undercover surveillance Reports and related materials as produced by DEA Special Agent Matthew Deignan et al. I assume Mr. McBride has transferred to you the related audiocassettes and videotapes.

  As I conveyed to Attorney John McBride, the Teti family is comprised of very close, personal friends of mine, and I am happy to provide you with any assistance you might require in your efforts to become familiar with the case. Frankly, I actually thought the case was *very* triable, and had anticipated favorable final Hearings on several of the evidentiary and procedural Motions which I previously filed with the Court, but which were not heard prior to Joe being "conned" by the McBride promises and guarantees of minimal jail time and/or freedom, and his subsequent decision to switch counsel.

  Needless to say, I feel that I was "burned" by McBride after having made a good faith no-charge-to-Joe attempt to help McBride with the case, and *his* request, on the Friday before trial, that I sit in second chair the following Monday, at trial. The issue of the confidential informant, Leo Lobello was something which we discussed in detail, however on the second day of trial, to my astonishment, he tried to hang me in open court with what he alleged was a conflict-of-interest. (The judge had an independent attorney interview Mr. Lobello, (twice) and it was determined that I had engaged no conflict). Nevertheless, in his post-trial Motion, McBride still tried to hang me with the conflict issue.

Rosemary Scapicchio, Esquire
August 9, 1999
Page Two

Continued...

    Thus, any help I can furnish in a John McBride-based "ineffective assistance of counsel" strategy, I would be happy to provide.

    If, after having reviewed Joe's file, you have any questions, or want to meet with me, please do not hesitate to contact me at your earliest convenience. It has been my pleasure to have spoken with you. I wish you good luck on behalf of Joe.

                                            Very truly yours,

                                            Bradford Eliot Keene

BEK/dw
Enclosures

LAW OFFICES
## McBRIDE AND ASSOCIATES
A PROFESSIONAL ASSOCIATION
THE WATERFRONT BUILDING
SUITE 2B
240 COMMERCIAL STREET
BOSTON, MASSACHUSETTS 02109

JOHN C. McBRIDE
MICHAEL F. GERMANO
WILLIAM A. KORMAN
BRETT LEVY

TE  17) 367-8844
FA.  17) 523-5153

September 22, 1999

Bradford Eliot Keene
Attorney at Law
Pinewood Park Suite C
7 Kimball Lane
Lynnfield, MA  01940

Re:   **Commonwealth vs. Joseph Teti**
      **Criminal No. 99-J-0237**

Dear Mr. Keene:

I have reviewed your letter with my associate, Will Korman and with my law clerk, Sara Uberman. Quite frankly, we are amazed at the abundance of falsehoods that you rely on in this letter. I will take each of your paragraphs one by one.

Once you see the trial transcript you will realize that your representation of the informant did indeed adversely affect the plea negotiations that I was having with the Office of the Attorney General. Specifically, the prosecutor, in the Judge's lobby, said that she was no longer able to negotiate a plea because their office felt that your conduct in connection with the representation of the informant would taint any plea, and only serve as a post conviction challenge. No one ever made any sweeping promises to Joseph, his family or you about being involved in any way shape or form with the Office of the Attorney General.

I indeed represented to you and the Teti family that the family should attend a bail hearing before Judge Donovan because I was going to ask that a reduced bail be imposed. The docket entries, which I previously submitted to Mrs. Teti, at her request, clearly reinforce that argument. No one said he was going home. This assertion is ludicrous.

The motions to dismiss and motions for prosecutorial delay, contrary to your assertions were not summarily denied. The new Assistant Attorney General filed a response to them. A hearing was held before Judge Donovan, after which they were taken under advisement and ultimately denied.

AOPX 1-63

Bradford Eliot Keene
September 22, 1999
Page 2

*[handwritten margin notes: "Major complaint for a mistrial / By McBride to Comply Discovery / Failure to Comply"]*

*[handwritten note with arrow: "Informant was not wired"]*

    The motions that you filed relating to the wiretap were frivolous. Obviously, you know nothing about the ramifications of General Laws chapter 272 and the use of body wires on informants. Accordingly, a motion to suppress this type of evidence resulting from the audiotapes and the videotapes in a public place was never filed because the law permits such one party consensual body monitoring. Every bit of chain of custody and every reward, promise and inducement provided to the informant was provided to me in timely fashion, by the government prior to trial. Informant regulations that were in use by the Office of the Attorney General were obtained by me and used by me during the course of this trial. —— *[handwritten: NOT TRUE, TRANSCRIPTS WILL]* *[handwritten right margin: 2 are]*

    Your next assertion that I indicated to you that in twenty-five years of practicing law this was the first time a Federal informant was actually flown in to testify at a local trial is ludicrous. You now know after speaking with Teti's lawyer and other lawyers that I have been involved in numerous Federal and State Court cases. In nearly every Federal case the government relies on the testimony of the informant who was brought in by the Drug Enforcement Agency and used as a tool to testify against our clients. *[handwritten: ?]*

    Now, most important of all, I will address a series of lies that are contradicted, in stark fashion, by your colloquy with the court that is on the record and will be produced for counsel's inspection and whoever else wants to look at the transcript of your unfortunate remarks before the Judge during the course of this trial. Mr. Korman, Ms. Uberman and I indicated that, at my request, the government was compelled to produce the identification of the informant who was present during these transactions. Kindly examine the docket entries to note the motions I filed in that regard. After this was done I indicated to you that the informant was indeed, Leo Lobello. In the middle paragraph of page two of your letter you say as follows: "to my surprise, I told you that I had represented Anthony Lobello and that his mother had retained me to attempt a transfer of Leo Lobello from prison in South Carolina to Massachusetts." This assertion is a bold faced lie. You never told me, you never told Sara and you never told Will Korman, who sat with me during the trial, that you were involved with Leo Lobello in any way, shape or form. Not until the prosecutor brought this to the Court's attention, in your absence, since you were late for trial one day, did the fact of your representation come before the Judge. I never asked you to sit in on the trial as a second chair. Indeed, your words before me and before my law clerk and before my associate is that you wanted to sit with me and learn from an experienced defense lawyer. Specifically, you wanted to watch

*[handwritten bottom right: R. ell]*

Bradford Eliot Keene
September 22, 1999
Page 3

"Yoda" work. These are your words, not mine. Obviously, with the benefit of hindsight it was a mistake for you to join yourself with us as a second chair at this trial. Your conduct was <u>illegal and unethical</u>. The Office of the Attorney General wanted to investigate <u>you</u> and refer your conduct to the Board of Bar Overseers.

Also, when you say that there was no prejudice from the activities that you participated in, you are clearly wrong. You, Joe Teti, Joe's mother and his present counsel must read the minutes of the trial transcript. In the lobby, in your absence, the prosecutor clearly and unequivocally said that during the luncheon recess, although she talked about the possibility of a plea bargain, her supervisors felt that it would be inappropriate because of your conduct and your conduct alone.

Your letter of September 20, 1999 is only an attempt to insulate your culpability from the eyes of other parties who may be deeply interested in this type of wrongdoing.

Lastly, Joe's brother came to our office and spoke about your illegal and unethical conduct before the Worcester Probate Court. He complained to me, to Mike Germano and my entire staff that <u>you</u> told him to lie about his assets in a probate matter. Apparently, that Judge still wants you investigated.

You caused Joe's brother substantial prejudice in Probate Court and you caused Joe himself substantial prejudice in Superior Court. Grow up and learn to accept responsibility for your own actions. The trial transcript, which contains your comments to the Judge's probing questions, will help Joe to point the finger of blame where it belongs.

Very truly yours,

John McBride

JCM:dpi
cc: Nancy Teti
Joseph Teti

Exhibit C

LAW OFFICES
## McBRIDE AND ASSOCIATES
A PROFESSIONAL ASSOCIATION
THE WATERFRONT BUILDING
SUITE 2B
240 COMMERCIAL STREET
BOSTON, MASSACHUSETTS 02109

JOHN C. McBRIDE
MICHAEL F. GERMANO
CARLOS J. DOMINGUEZ
WILLIAM A. KORMAN
JOSEPH P. GLEASON

TEL: (617) 367-
FAX: (617) 523-

February 4, 1999

Laurie Parris,
Assistant Attorney General
One Ashburton Place
19th Floor
Boston, MA 02108

Re:   Commonwealth vs. Joseph Teti
      Criminal No. 98-10755

Dear Attorney Parris:

    As you now know, I have been retained to represent Joseph Teti in connection with the indictments now pending against him in the Suffolk Superior Court. Brad Keene will be filing a withdrawal shortly.

    I am writing to you at this point to express my concern relative to the tactics of the drug enforcement agency and their use of the informant, Leo Lobello, in this case. As you probably know, Mr. Lobello knew Mr. Teti from their time growing up in Wayland Massachusetts. My understanding from my investigation in this case is that the informant was arrested in Framingham and began cooperating with law enforcement authorities as a direct or indirect consequence of this arrest. I am aware of what the informant said to Mr. Teti on numerous occasions in connection with his effort, along with the drug enforcement agency, to induce Mr. Teti in to committing a crime that ultimately culminated in the distribution of more than 200 grams of cocaine to Agent Deignan of the drug enforcement agency.

    In my view, Mr. Lobello is a critical witness and should be present and available, consistent with the mandate of Commonwealth v. Curcio since he was actively engaged and working for the drug enforcement agency when he caused my client's arrest. His statements to the defendant, his relationship with the Government, the promises, rewards and inducements made to him as a result of his relationship with the State and Federal Government are all obviously exculpatory and should be produced to me at this time.

Laurie Parris
February 4, 1999
Page 2

      I further understand that Mr. Lobello is in custody, out of state, as a result of his involvement with drugs while he was cooperating with members of law enforcement in this case. My understanding is that he is in a Federal Correctional facility in North Carolina and may or may not testify at a trial

      I would like the record to reflect that in my view he is an indispensable witness and is quiet critical on the issue of the defendant's innocence or guilt. If indeed I pursue a defense of entrapment and egregious misconduct on the part of the informant and the Commonwealth, then he should be produced for the defendant, both prior to trial so he can be interviewed, and obviously, during the course of trial so he can be cross-examined by the defendant in court

      I also intend to present to the court and the jury, if necessary, a psychiatrist, Dr. Gary Prince from Needham, Massachusetts. In addition, a psychologist, Dr. Douglas Phillips will also testify to the defendant's state of mind at the time of the incidence. I recognize my obligation to produce any and all reports to you. Presently, I am in the process of securing releases so these doctors can provide me with any and all reports made as a direct of their contact with the defendant in June, 1996 and earlier.

      It is quite obvious, that while working for the Government, he received things of value for his cooperation. I also understand that he participated in another arrest involving one, Gary Sweeney from Wayland, Massachusetts Predecessor counsel does not have any of this evidence. I believe it is critical to a fair defense of Mr. Teti that you produce this evidence for my inspection as soon as possible.

      Very truly yours,

      John C. McBride

JCM:dpi

Case 1:05-cv-10234-RWZ   Document 11   Filed 09/21/2005   Page 20 of 20


# MEMORANDUM

TO: JCM
FROM: Michael Germano
DATE: April 4, 1999
RE: TETI

---

Dear John:

I could not find the Teti file. You probably have it with you. Anyway, I am not sure all th[e] information in the Motion/Affidavit is correct. Please review and have Donna draft a new Motion/Affidavit if you need it. Also, pursuant to her "on-going duty to disclose", Lori Parris fa[xed] over the attached Informant Payment Record on Saturday. What happened to her "on-going dut[y] with regard to other informant information? Finally, I went to see Teti on Saturday and he is rea[dy] to go. He is hoping you can somehow get him 3 years. I impressed upon him the importance of [$] and he said his mother will have a check for at least $5,000.00 for us in court. I am opportunistic that there will be money for us today, but you know how the Italians hate to pay.

GOOD LUCK!!!